UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KURT HENRY VAN ZEELAND,

    Petitioner,

v.                                                Case No. 3:20-cv-875-BJD-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
and FLORIDA ATTORNEY GENERAL,

    Respondents.

_____

## ORDER

### I. STATUS

Petitioner, Kurt Henry Van Zeeland (Van Zeeland), an inmate of the Florida penal system, initiated this action through counsel by filing a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1; Petition). The Petition challenges a 2016 state court (Nassau County, Florida) conviction for second-degree murder. *Id*. Respondents filed an Answer to the Petition (Doc. 10; Response),[1] and Petitioner filed a Reply to their

_____

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

Response (Doc. 11; Reply). Upon review, no evidentiary proceedings are warranted in this Court.[2]

## II. STANDARD OF REVIEW

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. *See Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. *See Marshall v. Sec'y Fla. Dep't of Corrs.*, 828 F.3d 1277, 1285 (11th Cir. 2016). The

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corrs.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing *Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court finds that "further factual development" is unnecessary. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as fair[-]minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* [at 102] (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *Lockyer*, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

*Bishop v. Warden, GDCP*, 726 F.3d 1243, 1253–54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To do so, he must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust their claims, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999),

4

thereby alerting the appropriate state court of "the federal nature of the claim[s]," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). *See also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process.").

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. Under the doctrine of procedural default:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 747–748 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 316 (2011); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (internal citations modified).

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Once cause is established, "the

petitioner also must show actual prejudice from the alleged constitutional violation." *Id.* (citing *Sykes*, 433 U.S. at 84). "[I]n order to show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id.* (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)).

In the absence of a showing of cause and prejudice, a petitioner may still receive consideration on the merits of a procedurally defaulted claim if he can show that a fundamental miscarriage of justice would occur. As explained by the Eleventh Circuit:

> "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at 1171 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases,

6

allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 687. As explained in *Richter*:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

*Richter*, 562 U.S. at 104 (internal citations modified).

The two-part *Strickland* test applies to challenges to the validity of guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). The petitioner must still demonstrate that counsel's performance was deficient. *See id.* at 56-59; *Lynch v. Sec'y Fla. Dep't of Corr.*, 776 F.3d 1209, 1218 (11th Cir. 2015). To establish prejudice, however, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59 (footnote omitted); *Lynch*, 776 F.3d at 1218.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the *Strickland* test before the other." *Ward*, 592 F.3d at 1163. Since both prongs of the two-part *Strickland* test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." *Id.* (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in *Strickland*: "If it is easier to dispose of an ineffectiveness claim on the ground

8

of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at 105. As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." *Id.* (citing *Richter*, 562 U.S. at 105); *see also Evans v. Sec'y, Dep't of Corrs.*, 703 F.3d 1316, 1333–35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III. PERTINENT FACTS AND PROCEDURAL HISTORY[3]

On May 22, 2015, the State of Florida filed an information in Nassau County Circuit Court case number 2015-CF-334, charging Petitioner with second-degree murder for fatally shooting his wife on May 10, 2015. Resp. Ex. A at 21. On June 25, 2015, the State filed an indictment superseding the information and charging Petitioner with first-degree murder with a firearm. *Id.* at 31–33.

On September 7, 2016, Petitioner and the State entered into a plea agreement, titled Negotiated Plea of Guilty by Convenience and Sentence Range. *Id.* at 56–57. The next day, the trial court held a plea hearing, finding a sufficient factual basis to support the plea. *Id.* at 144–51. On October 13, 2016, in accordance with the plea, the trial court adjudicated Petitioner guilty of second-degree murder and sentenced him to life in prison with a 25-year mandatory minimum sentence for the use of a firearm pursuant to § 775.087(2)(a)(3), Fla. Stat. *See* Resp. Ex. A at 68–76, 87–139.

On November 8, 2016, Petitioner filed a *pro se* motion to withdraw guilty plea after sentencing pursuant to Florida Rule of Criminal Procedure 3.170,

---

[3] The Court takes judicial notice of Petitioner's state court dockets. *See McDowell Bey v. Vega*, 588 F. App'x 923, 926 (11th Cir. 2014) (stating that a district court may consider the contents of a publicly available docket sheet of plaintiff's criminal case).

which the trial court summarily denied on December 30, 2016. Resp. Ex. B at 4–12. He initiated a *pro se* appeal to Florida's First District Court of Appeal (First DCA), on January 9, 2017. *Id.* at 28–29. Petitioner filed a counseled initial brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), on April 3, 2017, and then a *pro se* initial brief on May 30, 2017. Resp. Ex. C at 2–13; Resp. Ex. D at 2–11. On September 15, 2017, the First DCA *per curiam* affirmed the trial court's decision without a written opinion in *Van Zeeland v. State*, 233 So. 3d 1049 (table) (Fla. 1st DCA 2017), and issued the mandate on October 13, 2017. Resp. Exs. E, F.

On October 19, 2017, Petitioner filed a *pro se* motion to mitigate sentence pursuant to Florida Rule of Criminal Procedure 3.800(c), which the trial court denied on October 30, 2017. Resp. Ex. G at 2–9, Resp. Ex. H at 2.

On April 19, 2018, Petitioner filed a *pro se* amended[4] motion to vacate or set aside judgment and sentence pursuant to Florida Rule of Criminal Procedure 3.850, raising five grounds for relief. Resp. Ex. J at 4–41. On May 14, 2018, the trial court summarily denied the Rule 3.850 motion, expressly addressing only ground one and giving Petitioner thirty days to file a written appeal. *Id.* at 42–44. Petitioner appealed the denial to the First DCA on May

---

[4] Although the motion was titled "amended," there were no prior Rule 3.850 motions.

22, 2018 and filed his *pro se* initial brief on July 5, 2018. *Id.* at 60; Resp. Ex. K at 2–20. The State elected to not file an answer brief. Resp. Ex. L at 2–3. On February 12, 2019, the First DCA *per curiam* affirmed the summary denial of the Rule 3.850 motion, without a written opinion, in *Van Zeeland v. State*, 267 So. 3d 999 (table) (Fla. 1st DCA 2019), denied Petitioner's *pro se* motion for rehearing, rehearing en banc, and written opinion on March 28, 2019, and issued the mandate on April 18, 2019. Resp. Exs. M, N, O, P.

On October 14, 2019, Petitioner filed a counseled petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel, which the First DCA *per curiam* "denied on the merits" on July 14, 2020 in *Van Zeeland v. State*, 298 So. 3d 1131 (table) (Fla. 1st DCA 2020). Resp. Ex. Q at 2–17; Resp. Ex. R.

On July 30, 2020, Petitioner filed his present Petition in this Court, raising two grounds for habeas relief.[5] *See* Doc. 1 at 15. On May 14, 2021, Respondents moved to stay the Petition so that Petitioner could obtain a ruling from the state trial court on his claim in ground four of his Rule 3.850 motion. Doc. 6. On June 4, 2021, the Court stayed and administratively closed this case, allowing Petitioner to "move to reopen and lift the stay upon completion of the exhaustion of his state court remedies." Doc. 7.

---

[5] Respondents concede the Petition is timely. *See* Doc. 10 at 9.

On January 14, 2022, Petitioner filed a counseled motion in state court,

requesting the trial court to enter a final order disposing of all his post-

conviction claims so that the stay could be lifted in his federal habeas corpus

case. Resp. Ex. S. On March 25, 2022, the trial court dismissed the motion as

moot, explaining in pertinent part:

> Here, regardless of the specific analysis completed by the trial
> court in reaching th[e] result, the trial court unequivocally denied
> Defendant's Rule 3.850 motion. As he does here, Defendant argued
> on appeal that the trial court erred because it failed to address all
> claims presented in the motion. Nevertheless, the DCA affirmed.
> Once the DCA issued its mandate affirming the trial court's order
> that denied Defendant's Rule 3.850 motion, proceedings on the
> motion concluded. It would be improper for the [c]ourt to revisit
> the merits of a motion that has already been disposed of on appeal,
> especially when Defendant's argument for revisiting the motion is
> a restatement of an argument that he raised in his appeal. *See
> Milton v. Keith*, 503 So. 2d 1312, 1313–1314 (Fla. 3d DCA 1987);
> *Sloane v. Sloane*, 625 So. 2d 1236, 1237 (Fla. 4th DCA 1993) ("The
> fact that [the appellate court] did not discuss one of the issues [on
> appeal] does not mean [the court] did not affirm that issue."); *New
> England Ins. Co. v. Int'l Bank of Miami, N.A.*, 537 So. 2d 1025,
> 1025 (Fla. 3d DCA 1988) ("[A] per curiam decision of the appellate
> court is the law of the case between the same parties on the same
> issues and facts, and determines all issues necessarily involved in
> the appeal, whether mentioned in the court's opinion or not.").
>
> Defendant asks the [c]ourt to issue a final order ruling on his
> motion for postconviction relief. However, the record shows that a
> final order already exists, and that the DCA affirmed that order on
> appeal. Because a final order already exists, Defendant's motion
> for a final order is moot. State court proceedings on Defendant's
> April 18, 2018 motion for postconviction relief have concluded.

Resp. Ex. T at 4–5 (internal citations modified and omitted in part).

On April 19, 2022, Petitioner moved to reopen and lift the stay of this action, which the Court granted on May 19, 2022. Docs. 8, 9.

## IV. ANALYSIS

### Ground One

As Ground One, Petitioner alleges his trial counsel was ineffective for misadvising him that he did not have a viable defense of self-defense pursuant to § 776.012(2), Fla. Stat. Doc. 1 at 5, 16–25.

Petitioner presented a similar claim in ground four of his Rule 3.850 motion. Resp. Ex. J at 27–34 ("Trial counsel provided ineffective assistance of counsel for failing to properly investigate into a claim of self-defense and misadvising the Defendant that he did not have a defense to the alleged offense[,] thereby depriving the Defendant's Sixth (6th) and Fourteenth (14th) Amendment rights . . . ."). The trial court summarily denied the Rule 3.850 motion, without specifically addressing ground four. *Id.* at 42–44. On appeal, Petitioner argued the trial court erred in failing to expressly address ground four, among others. Resp. Ex. K at 16–20. The First DCA *per curiam* affirmed the summary denial of the Rule 3.850 motion, without a written opinion, and then denied Petitioner's motion for rehearing, rehearing en banc, and written opinion. Resp. Exs. M, N, O, P. Subsequently, the state trial court dismissed as moot Petitioner's motion for a final order on his postconviction claims,

14

explaining that "a final order already exists" and "the DCA affirmed that order on appeal." Resp. Ex. T at 5.

Although the trial court did not expressly address this claim when it summarily denied the Rule 3.850 motion, the First DCA did not dismiss the appeal of the trial court's decision for lack of jurisdiction, even though Petitioner argued in his initial brief (as well as in his motion for rehearing) that the trial court erred in failing to expressly address this claim. If the First DCA had found the trial court's decision to be a non-final order for its failure to expressly address all grounds for post-conviction relief, the First DCA would have dismissed the appeal for lack of jurisdiction. *See Hunter v. Inch*, No. 3:17cv483/LAC/EMT, 2019 WL 2413030, at *23 n.14 (N.D. Fla. Feb. 25, 2019) (explaining that it cannot be presumed that the First DCA "would not have followed its own jurisdictional rules," including Fla. R. App. P. 9.030(b)(1)(A)[6] and Fla. R. App. P 9.140(b)(1)(D)[7]), *report and recommendation adopted*, 2019 WL 2413028 (N.D. Fla. June 7, 2019). "Because the First DCA did not dismiss the appeal for lack of jurisdiction," however, "it necessarily rejected Petitioner's argument [that the trial court erred by failing to rule on his claim] and

---

[6] Rule 9.030(b)(1)(A) provides that a DCA shall review, by appeal, "final orders of trial courts, not directly reviewable by the supreme court or a circuit court."

[7] Rule 9.140(b)(1)(D) allows a defendant to appeal, *inter alia*, orders denying relief under Rule 3.850.

15

adjudicated the claim on the merits under § 2254(d)." *Hunter*, 2019 WL 2413030, at *23 n.14; *see also Allen v. Sec'y, Fla. Dep't of Corrs.*, No. 3:15-cv-1378-J-39MCR, 2019 WL 447883, *9 (M.D. Fla. Feb. 5, 2019) (assuming that a claim, which the trial court failed to specifically address when it denied post-conviction relief, was entitled to AEDPA deference because it "was rejected through the general denial of the post[-]conviction motion" and the First DCA's subsequent affirmance thereof, and alternatively, denying the claim on the merits).

Here, as in *Allen*, addressing the claim in Ground One in accordance with the deferential standard for federal court review of state court adjudications, the Court finds, upon thorough review of the record and the applicable law, that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Nevertheless, even if the state court's adjudication is not entitled to deference, this claim must still be denied on the merits, because the record does not support a viable defense of self-defense pursuant to § 776.012(2), Fla. Stat. ("A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or

16

threatening to use such force is necessary to prevent imminent death or great bodily harm to himself . . . .").

First, the arrest and booking report does not reflect that Petitioner acted in self-defense when he shot his wife. *See* Resp. Ex. A at 10–11. The report describes the events as follows:

> On 05-10-15, I was called out to investigate a person being shot and killed . . . in Yulee, Florida. Upon my arrival, I observed a white female identified as Catherine Van Zeeland (decedent), slumped over in a chair on the front porch of the home, with what appeared to be a gunshot wound to the head.
>
> During my investigation, I made contact with two witnesses, a male and female, who reside together in a mobile home on the adjacent property on Van Zeeland Lane.
>
> The female witness [redacted] stated she heard what sounded like a gunshot. [She] advised she woke her boyfriend [redacted] and told him she heard a gunshot outside. [She] reported approximately five minutes later, she heard loud banging on her front door. [Redacted] stated [redacted] went to the front door to investigate.
>
> The male witness [redacted] stated his girlfriend [redacted] woke him and said she had heard a gunshot outside. [He] advised, a few minutes later, he heard loud banging on the front door of his home. [He] stated he went to the front door and discovered it was the listed suspect, Kurt Van Zeeland, banging on the door. [The male witness] stated Mr. Van Zeeland told him he had just shot and killed his wife. [The male witness] advised Mr. Van Zeeland told him he was going to go back home and commit suicide. [The male witness] reported with the help of his neighbor [redacted], they were able to restrain Mr. Van Zeeland until the arrival of law enforcement. [The male witness] advised Mr. Van Zeeland had recently complained to him about problems in his marriage, and stated his wife was not "loving towards him anymore."

17

> The neighbor [redacted] was also interviewed. Although [he] did
> not hear Mr. Van Zeeland directly admit to killing Mrs. Van
> Zeeland, he did hear him state, "I screwed up and I'm really
> scared."
>
> While on scene[,] Nassau County Sheriff's Office Crime Scene
> Technician Karl Griner was preparing to swab Mr. Van Zeeland's
> hands for gun powder residue. During this contact, Mr. Van
> Zeeland spontaneously uttered, "there is no need for that, I pulled
> the trigger."
>
> After securing a search warrant for the residence, Crime Scene
> Technicians began processing the scene. A possible murder
> weapon (handgun)[] was recovered from a couch in the living room
> of the home. The handgun had a discharged casing in the cylinder
> and there was the presence of what appeared to be blood on both
> the handgun and the couch.
>
> Based on the physical evidence at the scene, the statements of
> witnesses and spontaneous utterances of Mr. Van Zeeland[,] there
> is probable cause to believe that Mr. Van Zeeland murdered Mrs.
> Van Zeeland. This resulted in the unlawful killing of another
> human being, by an act imminently dangerous to another, evincing
> a depraved mind, although without any premeditated design.

*Id.* at 11; *see also id.* at 13–14 (confirming the recited events in the search

warrant affidavit and adding the police did not observe firearms near the

decedent's body).

In the fifteen-month period between the filing of the information and the

entry of the guilty plea, defense counsel was actively preparing for trial by

participating in discovery and filing various motions, including a motion to

appoint a toxicology expert and a motion for a neuropsychological evaluation

of Petitioner. *Id.* at 23–24, 43–44, 47–50, 52–54. Considering counsel's extended trial preparation, it is reasonable to assume that any facts supporting a viable defense would have been uncovered and explored prior to Petitioner's guilty plea.

Importantly, at the plea hearing, Petitioner acknowledged that his counsel had fully explained to him the implications of the guilty plea, including any possible defenses. *See id.* at 147–51. Similarly, the signed plea agreement provided that before entering his plea, Petitioner had been advised of the nature of the charges against him, the range of maximum allowable punishment, "all the possible defenses," and all mitigating circumstances. *Id.* at 56–57. Based on Petitioner's sworn statements and the trial court's earlier reading of the arrest and booking report, the trial court found there was "a sufficient factual basis to support the plea." *Id.* at 151.

Later, at the sentencing hearing, the State presented the testimony of Dr. Valerie Rao who conducted the decedent's autopsy. *Id.* at 106–07. On direct examination, Dr. Rao testified:

> [T]here were two gunshot wounds. Both of them [sic] coming very similar in location, one a little bit in the front, one a little bit behind[,] but very close together. So one of the wounds had what is referred to [as] a stippling, and stippling is a result of burned and unburned gunpowder that comes out of the barrel at the same time that the bullet is coming out, gets deposited in the skin, and even if you wash it off[,] it does not go away because it -- it has sunk too deep in the skin.

So that gunshot was probably two to three inches. The barrel was
about two to three inches from her head. The second gunshot
wound -- I'm not talking about the first and the second versus the
time frame, because I could not tell you that, but the second one
was a contact gunshot wound to the head, meaning that the gun
was not tight up against her head, but it was up against her head
because when I did the microscopic examination of the skin from
that particular gunshot wound I was able to see refractile particles
that is the gunpowder and one sees that only when the gun is in
contact.

*Id.* at 107–08. On cross-examination, Dr. Rao testified as follows:

Q     Dr. Rao, if you accept a hypothetical that -- that Ms.
Vanzeeland was actually seated in a chair on her front porch at the
time she was shot and in an upright position[,] would that suggest
to you that the two gunshots would have come in rapid succession?

A     Yes.

Q     And is that because either gunshot probably would have
killed her and she might have slumped over?

A     Yes.

*Id.* at 110.

Immediately after Dr. Rao's testimony, the State introduced the home

surveillance video of the front porch of Petitioner's home where the shooting

occurred. *See id.* at 111. Then, Petitioner presented his version of the events

in support of a mitigated sentence:

I'd like to give my statement on what happened that night
and at least put some of the questions to rest of why all of this came
about. Because of the statements that everybody else has given
towards me[,] [I] will drastically shorten the statement that I have

20

written of the events to just that day. I willingly leave the rest of it to the Court or anybody else to view later on if they choose.

We hadn't talked much in the past three or four weeks. We quarreled. We were arguing a lot about issues that we were having between us and our son. We kept our family issues pretty much at home. We didn't tell people what was going on. We tried to deal with them the best we could. I looked to a lot of my friends for help. Most of my friends expected -- looked at me as the strong person. I was the one most of them came to for help so when I was asking for help[,] they just figured I was venting. They figured I would work it out myself, me and my wife. It didn't happen that way.

I had done duty two weeks -- or a week prior to Mother's Day. We argued before I left over issues in the family. I came home that week. I spent the week on the couch. We didn't talk pretty much at all except at work. I got up Mother's Day morning and I loaded the tractor and other equipment that I needed to go do a job to help Doug clean the property that we had help him get. I talked to Steve about nine o'clock in the morning. We talked about needing food for the chickens, things we needed for the barn. We made an agreement to leave at ten o'clock when the feed store opened to go get the things we needed.

I went back in the house about 9:30. I hadn't talked to Cathy all morning. I sat down, was watching the news and she approached me and asked me if I'd go to breakfast with her. Like I said, we hadn't been talking. My first thought was she needed to spend the day with her son but I knew that wasn't going to happy [sic] very much, at least not until later in the day, so I agreed. We went to breakfast. It was a very tense[,] but yet[,] pleasant day. We went to breakfast. We went yard saling.

We came home about 1:30, went in the house, watched a little TV. She went on her porch. She had her own little porch. She liked to sit there and read. Anthony and Joey came over about -- around 2 p.m. We played some board games together, which we did periodically quite a bit when we were all talking and not dealing with issues we were dealing with. We took pictures on the front porch. Joey and Anthony left. I guess they took more pictures later.

They -- we had taken pictures to send to Michael. He's in prison right now. They left about 3:30.

About four o'clock Cathy and I took a bath. We did what we normally did in the bath. We owned a Jacuzzi bathtub. It's the only -- our Sunday ritual when we're talking, not fighting. This particular time we were fighting and talking -- we were not talking much for a long period. We got out of the tub, we both got dressed. I dressed to relax the rest of the day. I just put on a pair of shorts and a T-shirt. She got dressed in her normal clothes. I got a flavored malt drink, she got herself a glass of wine. Cathy looked at me and said she thought Anthony was high while he was over here. I told her to deal with it. I've tried to talk to Anthony about it, he wouldn't listen to me. That's what we'd been arguing about for a while. I grabbed my keys to be out there a little, I grabbed my drink, I grabbed a gun off the shelf by the door on the way out. I always take a gun out to the barn because we've got a problem with snakes, wild dogs in the area. It's just habit.

Went out to the barn, I put up the chickens, locked up the out[]buildings. On the way back to the barn I stopped and talked to Billy Taylor for a while, talked to him about helping him fix his truck. He had a leak in his radiator. I was going to help him put in a new radiator at the end of the week. Stopped and talked to Steve who rents the other trailer on the property. I collected the rent, went back toward the house, tended to the garden, tended to the dog, went back in the house. It was just before seven. As soon as I got in the house Cathy started yelling at me about not wanting -- wanting to deal with the issue anymore that we were fighting about. I felt lost, tried to get help. I talked to our preacher, talked to all of my friends. I've talked to his friends, I've talked to him. He wouldn't stop what he was doing. I was lost.

I told her that she needed to deal with it herself. The arguing intensified. I looked at her and I told her I was done, I couldn't take it no more, I would sign everything over and I would be gone in a week. I couldn't deal with it. Once upon a time I pushed my daughters away, tried to deal with it. I saw everything in the future falling apart. I just couldn't deal with it anymore. I told her

22

I was done, they could have everything, I was going to leave, just get away from it all.

We sat in silence for a few minutes. She sat in the chair, I sat on the couch. She turned to me and she said, I'm going to kill you. I grabbed my keys and wallet to take[,] then I headed for the door. I got the door partly open, she grabbed my arm and said, where are you going? I said, anywhere but here. She swatted my keys and wallet out of my hand and tried to slam the door shut. I was partially out so I caught the door above my left eye and it busted me open and I started bleeding but I slipped out the door anyways.

I went outside and tried to get in my truck because I was going to leave. I keep a spare key in the truck because I left the truck there for other people to use, but I had locked it up because of all the stuff I had loaded. I couldn't get in the truck. I was frustrated, upset, slammed my fist on the hood and went into my museum, also a man cave. It's where I put all of my stuff that I collected over the years. I sat in the chair for a few minutes. I poured myself another drink and I went over to Steve's house. We talked until dark. I pretty much poured everything out to him. It was getting dark, he wanted to go to bed. He told me to go home, she's probably sleeping anyways, everything would be better in the morning. I went home.

I walked on the porch. She's sitting in the chair with a gun in her hand. I turned to her. She said, I'm going to kill you. I grabbed the barrel of the gun, told her to let it go. She said, you're going to die tonight. I took the gun out of my pocket and I shot her. She fell over and let go of the gun. So I went in the house and dropped both guns on the couch. I went in the kitchen to get the phone, dropped to my knees and I fell apart. I was crying hysterically. I was lost. Everything was gone. My life was destroyed. I couldn't take it back. I went outside, I checked on her and sat down on the steps. I got up, ran all the way to Steve's house to get help. Steve calmed me down. He called Billy over and then Steve handcuffed me and he called 911. The police came and I was arrested. I spent the next month on suicide watch. And they filled me with medication. They said I need it. I wish I could take it all

back. I wish it would have never happened. All that I can say is I'm sorry. I have nothing else to say.

*Id.* at 123–29.

On cross-examination, the State asked Petitioner: "Mr. Vanzeeland, why the second shot?" *Id.* at 129. His response was: "I don't know. I just shot twice." *Id.*

The State argued in favor of a life sentence:

The Court . . . has heard evidence and seen the picture of how this crime actually occurred. There were two shots essentially execution style to Ms. Vanzeeland's head. There's in evidence the surveillance video from the front porch of this defendant as he killed his wife and I think it's especially sorry giving the story that this defendant just told the Court.

The time between the two shots -- there are flashes on the video that clearly demonstrate when those two shots occur and they are approximately 18 seconds apart and it simply undercuts any credibility that this defendant has in explanation of why he did what he did. Based upon the style of murder that occurred in this case and the impact that it has had[,] the State believes that a just sentence is life in prison.

*Id.* at 130–31.

Defense counsel's position was that the first flash on the video was Ms. Van Zeeland "lighting a cigarette," and "that the second flash was two shots so rapid that it appear[ed] to be just a long flash." *Id.* at 131–32.

In rebuttal, the State argued as follows:

Judge, so the record is clear[,] there is a cigarette that is lit on the video that is viewable, however[,] that cigarette was lit a

24

full two minutes, two and a half minutes prior to . . . the shots ever occurring. And approximately three or four times in between when the shots occur and when the cigarette was lit the cigarette lights up as he -- the draw on the cigarette occurring, and it is a completely different look, a completely different flash of light than the shots. They are completely separate and the Court can -- can tell that and the folks who watch the video can tell that.

In addition, I'd like to point out that Dr. Rao did not say the two shots automatically or necessarily happened in rapid succession. What she testified to was that it is a -- consistent with or is a plausible hypothesis that [defense counsel] laid out that they could be rapid succession but that's also -- that's how they testify. It's also possible it didn't happen that way, it's also consistent with it not happening that way and the video shows how it actually happened, that there were 18 seconds in between these two shots to the head.

*Id.* at 135–36.

In light of this record, Petitioner has not shown his trial counsel was ineffective for allegedly misadvising him on a self-defense theory. Petitioner was clearly aware of his version of the facts at the time he entered the plea, but even that version does not support a plausible self-defense theory. Petitioner testified that after his wife told him she was going to kill him, he "grabbed the barrel of [her] gun [and] told her to let it go"; then, he "took the gun out of [his] pocket and . . . shot her." *Id.* at 128. At that point, "[s]he fell over and let go of the gun." *Id.* Rather than calling an ambulance, Petitioner "went in the house and dropped both guns on the couch." *Id.* Then, he went outside again, "checked on her[,] and sat down on the steps." *Id.* at 129. When

25

he got up, he "ran all the way to Steve's house." *Id.* At that point, Steve, not Petitioner, called 911. *Id.* On cross-examination, Petitioner could not explain why he fired two shots. *Id.* Either one of these shots would have killed the decedent, as Dr. Rao testified. *Id.* at 110. And regardless of whether the shots came in rapid succession or were separated by eighteen seconds, the record does not support a viable self-defense theory. Since the record refutes Petitioner's allegations pertaining to self-defense, an evidentiary hearing is unwarranted. *Cf. Buhs v. Sec'y, Fla. Dep't of Corrs.*, 809 F. App'x 619, 630–32 (11th Cir. 2020) (finding "the record does not refute or undermine [petitioner's] allegations such that an evidentiary hearing would be unwarranted," where petitioner had evidence and two witnesses willing to take the stand in support of a prescription defense to the charge of morphine trafficking).

In addition, by choosing to plead guilty, Petitioner abandoned any defense and "rendered any further investigation pointless." *See* Resp. Ex. A at 56–57, 147–51; *Stano v. State*, 520 So. 2d 278, 280 (Fla. 1988); *Clift v. State*, 43 So. 3d 778, 779 (Fla. 1st DCA 2010) ("Where a defendant enters a plea and swears that he is satisfied with his counsel's advice, he may not later attack counsel's effectiveness for failure to investigate or defend the charge."); *Smith v. State*, 41 So. 3d 1037, 1040 (Fla. 1st DCA 2010) (finding that "by pleading

guilty to the charges, [defendant] waived his right to have counsel investigate or put forward a defense").

Further, even assuming trial counsel was deficient for misadvising Petitioner about a self-defense theory, Petitioner has not shown a reasonable probability that but for counsel's alleged ineffectiveness, Petitioner would not have pled guilty and would have insisted on going to trial.[8] Considering that Petitioner was always aware of his version of the facts while counsel was preparing for trial for well over a year, Petitioner's claim in Ground One appears to be an attempt to go behind his sworn representations at the plea hearing, which he cannot do. *See Stano*, 520 So. 2d at 279–80 ("These claims regarding ineffectiveness of counsel's assistance and the involuntariness of Stano's plea are an attempt to go behind the plea."); *Ezer v. State*, 10 So. 3d 1175, 1177 (Fla. 4th DCA 2009) ("A defendant cannot go behind his sworn assertions in a plea colloquy."); *Gidney v. State*, 925 So. 2d 1076, 1076–77 (Fla. 4th DCA 2006) (finding that a defendant who was convicted pursuant to a plea could not go behind the plea and raise, in a postconviction motion, issues that were known when he entered the plea); *see also Stano v. Dugger*, 921 F.2d 1125,

---

[8] At trial, Petitioner's self-defense theory would have been weighed not only against the video evidence and Dr. Rao's statements, but also against the testimony of Petitioner's neighbors and law enforcement officers who saw Petitioner immediately after the shooting. Significantly, as reported in the arrest and booking report and search warrant affidavit, none of these witnesses indicated anything about the shooting being done in self-defense.

1152 (11th Cir. 1991) (recognizing that the record of the plea proceedings may contradict any subsequent claim that counsel's representation was deficient). Therefore, Ground One is denied.

### Ground Two

As Ground Two, Petitioner alleges the trial court's denial of his motion to withdraw guilty plea, without a hearing, was contrary to and/or an unreasonable application of *Strickland*; *Hill*; *Santobello v. New York*, 404 U.S. 257 (1971); *Brady v. United States*, 397 U.S. 742 (1970); and *Boykin v. Alabama*, 395 U.S. 238 (1969). *See* Doc. 1 at 7, 26–39. Petitioner asserts that while many of the allegations in his motion to withdraw guilty plea were refuted by the plea colloquy, in denying the motion, the trial court failed to address one specific allegation, namely, that defense counsel advised him that if he entered an open plea of guilty, the State would recommend and the trial court would agree to a mandatory 25-year sentence. *Id.* at 30–31, 34–35 (citing Resp. Ex. B at 4–5). Petitioner also claims his trial "counsel rendered ineffective assistance by either deliberately misrepresenting or incorrectly telling Petitioner the State agreed to recommend twenty-five (25) years." *Id.* at 39. Petitioner also appears to argue his appellate counsel was ineffective for failing to argue that the Due Process Clause of the Sixth and Fourteenth

28

Amendments requires reversal of the trial court's order denying his motion to
withdraw guilty plea and remand for an evidentiary hearing. *See id.* at 35.

Respondents assume or concede that Petitioner's claims of trial court
error and ineffective assistance of appellate counsel are exhausted, but argue
that his claim of ineffective assistance of trial counsel is not. *See* Doc. 10 at 39–
42. The Court bypasses the exhaustion issue because the claims raised in
Ground Two must nevertheless be denied on the merits. *See Santiago-Lugo v.
Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (stating that "even when the
defense has been preserved and asserted by the respondent throughout the
proceeding, a court may skip over the exhaustion issue if it is easier to deny
(not grant, of course, but deny) the petition on the merits without reaching the
exhaustion question") (citing *Granberry v. Greer*, 481 U.S. 129, 131 (1987)); *see
also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be
denied on the merits, notwithstanding the failure of the applicant to exhaust
the remedies available in the courts of the State.").

Contrary to Petitioner's argument, in its order denying Petitioner's
motion to withdraw guilty plea, the trial court expressly identified Petitioner's
allegation that he entered his plea based on trial counsel's mis-advice that the
State would recommend and the trial court would agree to a mandatory 25-
year sentence, if Petitioner entered an open plea of guilty. Resp. Ex. B at 11.

The trial court reasoned Petitioner's allegations were refuted by his written plea and statements at the plea hearing, the pertinent portions of which the trial court quoted and attached to its order. *Id.* at 11–12.

Petitioner appealed the denial to the First DCA, where his court-appointed attorney filed an *Anders* brief, arguing the appeal was without merit for the following reasons:

> Mr. Vanzeeland's motion [to withdraw guilty plea] certainly created an adversarial relationship with trial counsel. He specifically said that he would not have entered a plea but for his lawyer's promise that he would get a 25[-]year prison sentence. Normally, this would trigger the process outline[d] in *Shepard v. State*, 17 So. 3d 275 (Fla. 2009)[,] and require the judge to hold a limited hearing and appoint conflict-free counsel. *Shepard*, above, makes it clear that this process does not need to be followed if the allegation made in the *pro se* motion is refuted by the record. . . .

> Mr. Vanzeeland's only complaint in his motion is that his lawyer promised him a 25[-]year sentence. The plea colloquy, as the judge wrote, refutes this allegation. The judge asked him under oath if anyone had promised him a particular sentence from the judge. Mr. Vanzeeland answered that no one had done so. The judge then told him the sentence might be from a minimum of 25 years mandatory to life in prison. The judge [asked:] "Understanding that at sentencing the court can impose that maximum life sentence, is it still your wish to proceed further?" Mr. Vanzeeland said he still wanted to enter the plea.

> In addition, counsel in his closing argument at sentencing to the judge, acknowledged the real possibility that the judge would impose a sentence greater than 25 years. The lawyer's presentation was focused on trying to convince the judge not to sentence his client to life.

> The law allows a judge in such a setting to rely on the answers given under oath by Mr. Vanzeeland during the plea colloquy. *Johnson v. State*, 22 So. 3d 840 (Fla. 1st DCA 2009)[.] A trial judge may reject any contrary assertion made as part of a motion to withdraw a plea. *Iacono v. State*, 930 So. 2d 829 (Fla. 4th DCA 2006)[.] The judge identified the appropriate law that applied to this case[.] The record in this case supports the denial of the motion to withdraw the plea as being conclusively refuted by the record.

Resp. Ex. C at 10–11 (internal record citations omitted; case citations modified).

In addition to the counseled *Anders* brief, Petitioner was allowed to file a *pro se* initial brief, in which he argued: (1) the trial court conducted an improper plea colloquy that did not adequately establish Petitioner had not been promised anything as to what his sentence would be; and (2) the trial court erred in denying his motion to withdraw guilty plea without a hearing, because the facts and circumstances of the plea colloquy and the record attachments did not conclusively refute his claim. Resp. Ex. D. The First DCA *per curiam* affirmed the trial court's decision without a written opinion.[9] Resp. Ex. E.

---

[9] Subsequently, Petitioner raised a somewhat related issue as ground three of his Rule 3.850 motion, where he alleged ineffective assistance of trial counsel for misadvising him that by entering a guilty plea, he would be sentenced to 25 years in prison. Resp. Ex. J at 21–26 ("Was it not for counsel telling the Defendant that the entry of a guilty plea would mean he would not receive the maximum possible sentence, the Defendant would have proceeded to trial."). However, as Respondents point out, that claim was premised on what counsel promised *the trial court* would impose, rather than on what counsel advised *the State* would agree to. Doc. 10 at 41–42.

Petitioner then raised the issue of ineffective assistance of appellate counsel in his counseled petition for writ of habeas corpus, in which he argued that the First DCA should either grant him a new appeal or a remand for an evidentiary hearing on his motion to withdraw guilty plea. Resp. Ex. Q at 2–17. Specifically, he claimed:

> Appellate counsel provided ineffective assistance by failing to raise the meritorious issue that the trial court abused its discretion by denying Petitioner's motion to withdraw plea without a hearing. The trial court's rationale and record attachments of the plea colloquy and signed negotiated plea form did not conclusively refute Petitioner's allegations that trial counsel informed him that "if he entered an open plea of guilt[y] to the court[,] the State would recommend and the court would agree to sentence the defendant to a mandatory 25 years [sic] [Department of Corrections] sentence."
> . . . .
>
> Accordingly, had appellate counsel raised this issue, due process and case law would require reversal of the denial order and remand for an evidentiary hearing.

*Id.* at 6–7, 14. The First DCA *per curiam* denied the petition for writ of habeas corpus "on the merits," without elaboration. Resp. Ex. R.

The state court's adjudications of Petitioner's claims alleged in Ground Two are entitled to deference. Upon thorough review of the record and the applicable law, the Court finds that the state court's affirmance of the denial of Petitioner's motion to withdraw guilty plea and denial of his petition for writ of habeas corpus were neither contrary to nor an unreasonable application of

federal law, and were not based on an unreasonable determination of the facts
given the evidence presented to the state court. *See* 28 U.S.C. § 2254(d).
Nevertheless, even if the state court's adjudications are not entitled to
deference, the claims raised in Ground Two must still be denied. Whether
couched as claims of trial court error or ineffective assistance of counsel, the
claims must be denied because they are refuted by the record. Petitioner
essentially alleges he should be allowed to withdraw his plea based on
counsel's advice that if he entered a guilty plea, the State would recommend
and the trial court would agree to a 25-year sentence. However, Petitioner is
not entitled to federal habeas relief or an evidentiary hearing, because his
claims are conclusively refuted by the written plea agreement and his sworn
statements at the plea hearing. *See Gonzalez-Castro v. State*, 22 So. 3d 94, 95–
96 (Fla. 3d DCA 2009) ("[A]s the plea transcript conclusively refutes the
defendant's claim that he was under the 'misimpression' that he would be
sentenced to approximately nineteen months in prison and that he would not
have entered into the plea absent the 'misimpression,' we affirm the trial
court's summary denial of the motion to withdraw plea."); *Pease v. State*, 965
So. 2d 857, 860 (Fla. 4th DCA 2007) (affirming the trial court's summary denial
of defendant's post-conviction motion because the record refuted his claim that

"his plea was rendered involuntary by his counsel's erroneous advice and
assurances as to the actual sentence he would receive").

The written plea agreement, which Petitioner signed and initialed,
states in relevant part:

> I hereby enter my plea of guilty because I consider it to be in my
> best interest. Before entering such plea of guilty, I was advised of
> the nature of all the charges against me, the statutory offenses
> included within such charges, the range of maximum allowable
> punishments for each charge, all the possible defenses to each
> charge, and all circumstances in mitigation of such charges. . . .

> Specific Terms of Negotiated Plea and Sentence Range:

> My plea has been negotiated in this case, and I understand that it
> is as follows:
> 1.    PG/AG Murder 2 with and use of a firearm with discharge of
>    the firearm resulting in the death of a person; [Defendant's
>    initials]
> 2.    **My sentence will be in the range between 25 years
>    Minimum Mandatory (day for day) and up to and
>    including LIFE. Any sentence greater than 25 years
>    Minimum Mandatory (day for day) may also be
>    imposed as Minimum Mandatory (day for day) prison
>    time at the discretion of the Court; [Defendant's
>    initials]**
> 3.    **The Court will determine my sentence after a
>    sentencing hearing at which I will [be] permitted to
>    offer mitigation and the State will be permitted to
>    offer aggravation; [Defendant's initials]** and.
> 4.    The Court will order a Pre[-]Sentence Investigation Report.

> **I consider this negotiated Plea and Sentence Range to be to
> my advantage, and I have freely and voluntarily entered
> my plea of guilty. I have not been offered any hope of
> reward, better treatment, or certain type of sentence to get
> me to enter this plea, other than the sentence set forth**

**above. I have not been promised by anyone, including my attorney, that I would actually serve any less time than set forth above**. . . . I have not been threatened, coerced, or intimidated by any person, including my attorney, in any way in order to get me to enter this plea.
. . . .

<u>Acknowledged in Open Court</u>:
In open Court, I have under oath acknowledged to the Judge of this Court that:
. . . . I have entered into and signed this plea of guilty freely and voluntarily;
. . . . **This form represents the sole and complete agreement between myself and the State. No other agreements, representations, or promises have been made by myself, my attorney, the Court, or representative of the State**; and
. . . . **At sentencing the Court may impose the maximum sentence allowed by law**.

Resp. Ex. A at 56–57 (emphasis added).

At the plea hearing, defense counsel informed the trial court that he wished "to make a thorough representation" of the contents of the proposed plea agreement. *Id.* at 144. He explained:

With the agreement of the State, Mr. Vanzeeland has authorized me to withdraw his previously entered plea of not guilty and enter a plea of guilty by convenience to the lesser-included offense as described by the State, that being of murder in the second degree, and it is murder in the second degree with the firearm enhancement.

The specific terms of this negotiated plea and sentence range are as follows:

Mr. Vanzeeland would enter his plea of guilty to second degree murder, by convenience, and it is with the use of a firearm and the discharge of a firearm resulting in the death of a person,

and **his sentencing range would be within 25 years minimum mandatory, which Mr. Vanzeeland understands means day for day, up to and including the possible sentence of life, and any sentence would be imposed by this Court greater than the 25 year minimum mandatory day for day may also be imposed as a minimum mandatory day for day, and Mr. Vanzeeland understands that, in terms of his prison time, and that would be at the discretion of the Court after a sentencing hearing, the Court will determine Mr. Vanzeeland's sentence after a hearing of which Mr. Vanzeeland would be permitted to offer mitigation and the State would be permitted to offer aggravation**.

The Court will order a presentence investigation . . . to be received before the sentencing hearing.

The Court would impose the court costs, we don't know that number, but it will be that determined by the statute and by the other things.
. . . .

Mr. Vanzeeland understands that in this case prior to this date and prior to the trial that is scheduled I did not file on his behalf any suppression motions, and that was for two reasons in this case. As far as the Fifth Amendment, there were no -- there was no interview post-arrest or custodial interrogation by the police of Mr. Vanzeeland, and as far as suppression for the Fourth Amendment, such as search and seizure, though there was a search of Mr. Vanzeeland's residence, the officers first obtained a warrant, and upon my review there was no basis on which to attack the sufficiency or the propriety of the warrant that they obtained first.
. . . .

And Mr. Vanzeeland agrees that, to him, there is no evidence that would be exculpatory in terms of DNA.

We do stipulate to a factual basis, and I would submit this form to Your Honor that's signed by Mr. Vanzeeland and myself

36

and by the Court as -- I mean by the State as far as the agreement
to plead to a lesser.

*Id.* at 144–46 (emphasis added).

Then, after placing Petitioner under oath, the following exchange took

place between the trial court and Petitioner:

THE COURT: Have you read this two-sided form titled
Negotiated Plea of Guilty by Convenience and Sentence Range?

THE DEFENDANT: Yes, sir.

THE COURT: After reading it, did you sign it?

THE DEFENDANT: Yes, sir.

THE COURT: And is that your signature at the bottom of
the back page?

THE DEFENDANT: Yes, sir.

THE COURT: Did you have enough time to discuss this
matter with your lawyer, Mr. Boston?

THE DEFENDANT: Yes, sir.

THE COURT: And did he explain it to you fully?

THE DEFENDANT: Yes, sir.

THE COURT: Including the possible defenses you might
have, as well as the implications of your plea?

THE DEFENDANT: Yes, sir.

THE COURT: And are you fully satisfied with his
representation of you?

THE DEFENDANT: Yes, sir.

THE COURT: Has he done everything that you have asked, including taking all depositions, talking to all witnesses and providing you with copies of all discovery which you may have requested, including tapes, videos, depositions and statements?

THE DEFENDANT: Yes, sir.

THE COURT: Is there anything else you wish your lawyer to do before proceeding further with this plea?

THE DEFENDANT: No, sir.

THE COURT: You understand that by entering this plea[,] you give up certain rights, and among the rights that you give up are the right to a trial, the right to call witnesses, to examine and cross-examine witness[es], as well as the right to remain silent?

THE DEFENDANT: Yes, sir.

THE COURT: In addition, you give up the right to appeal all matters related to this judgment and sentence, including the issue of guilt.

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that?

**Mr. Vanzeeland, it's my understanding that no one has made any promises to you whatsoever as to what sentence the Court would impose?**

THE DEFENDANT: **Yes, sir.**

THE COURT: **You understand that the Court has to impose a minimum 25[-]year mandatory sentence?**

THE DEFENDANT: **Yes, sir.**

38

THE COURT: **You also understand that the Court can, in fact, impose a life sentence upon you?**

THE DEFENDANT: **Yes, sir.**

THE COURT: **Understanding that at sentencing the Court can impose that maximum life sentence, is it still your wish to proceed further?**

THE DEFENDANT: **Yes, sir.**

THE COURT: Has anyone threatened you, coerced you, brought any pressure to bear on you whatsoever --

THE DEFENDANT: No, sir.

THE COURT: -- to enter this plea?

You are entering this plea because it -- you believe it to be in your best interest?

THE DEFENDANT: Yes, sir.

THE COURT: And you are entering this plea freely, willingly and voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: Are you currently under the influence of either drugs, alcohol or medication?

THE DEFENDANT: I have medication, sir.

THE COURT: Medication for what condition?

THE DEFENDANT: Depression and anxiety.

THE COURT: And what medication do you take?

MR. BOSTON: Zoloft for depression and Buspar for anxiety.

39

. . . .

THE COURT: Have you taken them today pursuant to your normal regiment?

THE DEFENDANT: I took it this morning as I normally do, yes, sir.

THE COURT: Both pills?

THE DEFENDANT: Both pills.

THE COURT: Did that affect your ability to understand or communicate with your lawyer, Mr. Boston?

THE DEFENDANT: No, sir.

THE COURT: Did it affect your capacity to understand the negotiated Plea of Guilty by Convenience and Sentence Range form that you read and signed?

THE DEFENDANT: No, sir.

THE COURT: Has it affected your capacity to understand what we are doing in court this morning?

THE DEFENDANT: No, sir.

THE COURT: The Court, having earlier read the arrest and booking report, finds that there is a sufficient factual basis to support the plea.

*Id.* at 147–51 (emphasis added).

On this record, Petitioner was undisputably aware that the plea agreement contemplated a sentencing range of 25 years to life in prison, that it was solely in the trial court's discretion to impose a sentence in that range

40

after a sentencing hearing and consideration of any mitigating and
aggravating factors, and that the trial court could actually "impose the
maximum sentence allowed by law." *Id.* at 56–57. Importantly, Petitioner
acknowledged, under oath, that the plea agreement represented "the sole and
complete agreement between [Petitioner] and the State," that "[n]o other
agreements, representations, or promises have been made by [Petitioner], [his]
attorney, the Court, or representative of the State," that Petitioner has "not
been offered any hope of reward, better treatment, or certain type of sentence
to get [him] to enter this plea, other than the sentence set forth above," and
that he has "not been promised by anyone, including [his] attorney, that [he]
would actually serve any less time than set forth above." *Id.* At the plea
hearing, Petitioner swore that he understood these terms and wished to
proceed with his guilty plea. *See id.* at 147–51.

Any promise or advice that the State would recommend and the trial
court would agree to a 25-year sentence if Petitioner entered a guilty plea is
plainly inconsistent with the signed plea agreement and Petitioner's sworn
statements to the court. Even if the State had promised to recommend a 25-
year sentence, under the terms of the plea agreement that Petitioner signed
and confirmed at the plea hearing, the trial court was the final authority to
decide Petitioner's sentence after considering any mitigating and aggravating

factors at the sentencing hearing. *See Pitts v. State*, 181 So. 2d 739, 740 (Fla. 1st DCA 1966) (stating that "the sentence imposed following a plea of guilty is solely within the discretion of the trial judge, subject only to the condition that it meets the standards provided by law"). Petitioner seems to concede as much. *See* Doc. 11 at 7–8 ('Trial counsel's representation that the State would recommend 25[]years would not render the plea meaningless because, as written in the plea form and acknowledged by Petitioner, the trial court would still determine the sentence.").[10]

Further, assuming the State had made such a promise in contradiction to the terms of the plea that it signed, Petitioner "was obligated to speak up at the plea conference and ask the court about the discrepancy." *Jones v. State*, 680 So. 2d 585, 587 (Fla. 4th DCA 1996). "He could not stand mute, accept the

---

[10] The Court notes that counsel did not "blatantly misstate[]" to Petitioner the penalty provisions of the crime with which he was charged, which makes this case distinguishable from both *Yordan v. Dugger*, 909 F.2d 474, 478 (11th Cir. 1990) (remanding the case to the district court for further consideration of petitioner's § 2254 petition, where petitioner alleged his counsel stated that if petitioner pleaded guilty, he would become eligible for parole within five to seven years and the record contained two personal letters tending to prove that counsel in fact made this misrepresentation, but petitioner was actually facing a mandatory 25-year term of imprisonment on the same count), and *Holmes v. United States*, 876 F.2d 1545, 1553 & n.9 (11th Cir. 1989) (remanding the case to the district court for further consideration of petitioner's § 2255 motion, where petitioner alleged "his attorney grossly misinformed him of the parole consequences under the [continuing criminal enterprise] statute and the trial court failed to advise [him] of his ineligibility for parole," and where the record contained a handwritten letter from counsel that could have supported petitioner's allegation that counsel had indeed misrepresented the nature of parole eligibility).

42

benefits of the plea, and then collaterally attack its voluntariness on the basis of something that should have been cleared up at the time of the plea." *Id.* To the extent Petitioner attempts to go behind his sworn representations made at the plea hearing, as stated previously, he cannot do so. *See Stano*, 520 So. 2d at 279–80; *Ezer*, 10 So. 3d at 1177; *Gidney*, 925 So. 2d at 1076–77. Petitioner's solemn declarations during his plea colloquy carry a strong presumption of truth and "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977); *see also Winthrop-Redin v. United States*, 767 F.3d 1210, 1217 (11th Cir. 2014) (stating that a defendant who makes statements under oath at a plea colloquy bears a heavy burden to show his statements were false); *Stano*, 921 F.2d at 1152. Therefore, the trial court was entitled to accept Petitioner's guilty plea as freely and voluntarily given under the terms of the plea agreement and Petitioner's solemn declarations during the plea hearing.

Petitioner is not entitled to withdraw his plea merely because his "sentence does not conform to what his attorney led him to expect." *Lepper v. State*, 451 So. 2d 1020 (Fla. 1st DCA 1984) (citing *Morgan v. State*, 414 So. 2d 593, 593 (Fla. 3d DCA 1982)); *Manning v. State*, 203 So. 2d 360, 361 (Fla. 2d DCA 1967) ("A criminal defendant cannot be given the option of rejecting his uncoerced plea of guilty if his sentence fails to conform with his expectations.");

*see also State v. Leroux*, 689 So. 2d 235, 238 (Fla. 1996) ("A defendant who is informed by the court during the plea colloquy that he may have to serve every day of a ten-year sentence could hardly reasonably rely on counsel's advice to the contrary."). Therefore, Ground Two is denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     The Petition (Doc. 1) is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment dismissing this action with prejudice and close this case.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability.[11] Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed

---

[11] The court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller–El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). Upon due consideration of the record as a whole, this Court will deny a certificate of appealability.

in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of July, 2025.

_____
BRIAN J. DAVIS
United States District Judge

Jax-11 7/7
c:
Counsel of Record

45